FILED
8/28/2025 11:17 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Cheryl Watts DEPUTY

**CAUSE NO.** DC-25-14793

| | | |
|---|---|---|
| **MODE GLOBAL, LLC,** | § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | 101st **JUDICIAL DISTRICT** |
| | § | |
| **THEODORE KURIGER and** | § | |
| **CHRISTIAN KIEFER,** | § | |
| | § | |
| *Defendants.* | § | |
| | § | **DALLAS COUNTY, TEXAS** |

## VERIFIED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

Plaintiff Mode Global, LLC ("MODE") files this Verified Petition and Application for Temporary Restraining Order and Temporary Injunction to enjoin and restrain its former executives, Theodore Kuriger and Christian Kiefer ("Defendants"), from continuing to breach their Executive Employment Agreements with MODE (the "Employment Agreements") and the Equity and Asset Purchase Agreement ("EAPA") they entered into with MODE.

Less than a year ago, Defendants sold a portion of their company, Jillamy, to MODE, and received approximately $35 million out of the transaction. Nevertheless, Defendants, with other now former MODE employees, have engaged in a scheme involving: (1) improper competition against MODE; (2) siphoning business and profits from MODE; (3) secretly setting up and operating competing businesses outside of MODE and creating fraudulent agreements; (4) payment of kickbacks; (5) awareness and encouragement of bribes being paid; and (6) tortious interference with MODE's customer contracts and employment contracts of MODE employees. All of this violates Defendants' Employment Agreements and EAPA (and the law), and Defendants threaten to continue breaching those agreements. This is likely just the tip of the iceberg—MODE expects to uncover numerous other bad acts as it continues its investigation.



EXHIBIT

A

Without a temporary restraining order and injunction, MODE will experience significant irreparable harm, including the loss of goodwill, the permanent loss of future business, breaches of enforceable agreements, and potentially the dissemination of MODE's confidential information. Accordingly, MODE seeks an injunction preventing Defendants from: (1) using or disclosing to others any of the MODE Confidential Information; (2) competing with MODE within the terms of the Non-Compete Provisions; and (3) soliciting MODE's Customers, Carriers, Agents, Employees, and Contractors within the terms of the Non-Solicit Provisions.

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action by agreement of the parties. Both Kuriger and Kiefer executed the Employment Agreements, which are substantively identical. Under Section 9, the parties agreed that:

> Notwithstanding the terms and conditions of any arbitration agreement between MODE and Executive, either of the Parties **shall be entitled to seek a temporary restraining order and any other emergency injunctive relief from a court of competent jurisdiction**, restraining the other party from committing or continuing any violation of the provisions of Sections 2 and/or 3 until such time as the controversy may be adjudicated in arbitration. With respect to any such enforcement action, **the Parties irrevocably submit to the exclusive jurisdiction of any federal or state court located within Dallas County, Texas** or, if a mandatory venue provision is applicable, to the jurisdiction of any other federal or state court within the State of Texas required to hear such matter by any such applicable mandatory venue provision. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

True and correct copies of the Employment Agreements are attached hereto as **Exhibit A**.

2.    The Parties also entered into substantively identical Arbitration Agreements. Such agreements specifically carve out proceedings such as this: "[e]ither party may apply to a court of

competent jurisdiction for temporary or preliminary injunctive relief . . . in connection with an arbitrable controversy . . . ."[1]

3.      The equitable relief sought herein is within the jurisdiction of this Court.

4.      Venue is proper in this Court because the Parties "irrevocably waive[d], to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute." Employment Agreements, § 9.

5.      This Court also has venue over this matter because (1) MODE's principal offices are in Dallas County, and (2) a substantial part of the events giving rise to the claims in this Petition occurred in Dallas County. *See* Tex. Civ. Prac. & Rem. Code§ 15.002(a)(l), (3).

## II.    DISCOVERY CONTROL PLAN

6.      MODE intends to conduct discovery under Level 3, under Texas Rule of Civil Procedure 190.4.

## III.    RULE 47 STATEMENT OF RELIEF SOUGHT

7.      MODE states that it seeks only nonmonetary relief in this action.

## IV.    PARTIES

8.      MODE Global, LLC is a limited liability company organized under the laws of the State of Delaware. MODE's principal place of business is 14785 Preston Road, Suite 850, Dallas, Texas, 75254.

9.      Theodore Kuriger is an individual residing in the State of Pennsylvania. He can be served with process at his residence at 3690 Fountain Circle, Fountainville, Pennsylvania, 18923.

---

[1] MODE has also filed an arbitration against Defendants, which is currently pending before the American Arbitration Association. This action seeks injunctive relief to prevent Defendants from continuing to inflict irreparable harm on MODE.

10.     Christian Kiefer is an individual residing in the State of Pennsylvania. He can be served with process at his residence at 10 Blayze Court, Newton, Pennsylvania, 18940.

## V.     BACKGROUND FACTS

### A.     MODE'S Business and Acquisition of Jillamy

11.     MODE is a leader in the freight brokerage and logistics industry. Through MODE's family of brands, MODE has more than 30 years of experience providing transportation brokerage services with a focus on customer service. MODE provides full truckload, intermodal, less-than-truckload, ocean, air, and parcel freight brokerage services.

12.     On November 1, 2024, MODE acquired a portion of the business and assets of Jillamy Inc. and its various affiliates (together, "Jillamy") pursuant to the EAPA. Jillamy was previously owned by Kiefer and Kuriger, who made approximately $35 million through the transaction. A true and correct copy of the EAPA is attached hereto as **Exhibit B**.

13.     Jillamy was previously a longstanding sales agent of MODE, bringing in customers to MODE and operating the customers' freight, and receiving a commission in return.

14.     As part of the EAPA, Kuriger and Kiefer became Senior Vice Presidents of MODE, which paid them a salary of $300,000.00 each to manage the acquired business and help support the integration of the acquired business with MODE's business.

15.     Under the EAPA, if the acquired Jillamy business generated sufficient earnings under Kuriger and Kiefer's leadership, Jillamy would be eligible to receive significant earnout payments of up to $55 million.

16.     Kuriger and Kiefer made several representations and other promises in the EAPA that MODE relied upon in deciding to purchase the assets.  Part of the overall transaction included

Kuriger's and Kiefer's agreements to become executives at MODE and to abide by the terms of their Employment Agreements.

**B.** **Kuriger and Kiefer's Access to Proprietary and Confidential MODE Information**

17. Both the EAPA and the Employment Agreements contain several protective covenants, including non-solicitation and non-competition provisions, which generally state that Kuriger and Kiefer cannot compete against MODE or solicit certain customers and employees away from MODE.

18. MODE entrusted Kuriger and Kiefer to preserve and develop MODE's business relationships with critical components of its business. As such, they had crucial responsibilities within MODE.

19. Kuriger and Kiefer were also provided daily access to Company confidential information, including, among other things: (1) MODE's confidential client and carrier lists; (ii) MODE's confidential sales and marketing strategies; (iii) MODE's confidential pricing information, and (iv) MODE's confidential internal operations procedures (together, the "MODE Confidential Information"). Each of these categories of information was developed over time through substantial effort, and each provides MODE a competitive advantage in the provision of global logistics solutions that supply the world.

20. For example, MODE's client lists do not just include customer identities. Rather, MODE has compiled extensive information detailing pricing, types of sales (broken out by methods of transportation), load data, volume data, and MODE's activity and revenue with a customer. Similarly, MODE's sales and marketing strategies are not general sales strategies that anyone can hear in a TED talk. Rather, MODE's marketing and sales strategies are customized to the client; proposals are based on the individual assessments and client communications that

MODE uses to distinguish itself from competitors. Consistent with this individualized service, MODE's pricing is based on the unique complement of services provided to each customer and is not published or readily ascertainable from public sources. And because pricing is rolled up with the particular services provided, information about MODE's pricing necessarily reveals the terms and method of its services to each customer. Moreover, MODE negotiates and offers individualized pricing terms that are specific to a customer and highly confidential.

21.     Were a competitor to gain access to the MODE Confidential Information, it would give MODE's competitors an unfair competitive advantage at MODE's expense. The competitor would be able to exploit this information to solicit MODE's customers and agents and undercut MODE's prices, thereby causing irreparable harm to MODE.

22.     MODE has taken numerous steps to ensure the confidentiality of its information and to maintain its secrecy. Electronically stored information, including client information, pricing, and marketing, is maintained on encrypted servers and password-protected. Employees are issued login information upon hire and are required to follow internet security procedures, including two-factor authentication each time they login to Office 365. Settings in MODE's email system also restrict forwarding of information to external servers. In addition, MODE compartmentalizes access to its confidential information on a need-to-know basis. Sales personnel cannot access confidential information needed solely by employees in finance, for example. When working remotely, MODE personnel use an encrypted VPN to connect to its network and file share system. And VPN access carries over the same compartmentalization, barring access to information unless the employee is authorized to obtain it.

23.     MODE also monitors computer activity through third-party IT support firms. Suspicious activity, such as a login from a location not ordinarily associated with an employee's

ID triggers an alert; access to the system is barred until user identity is confirmed. Access to MODE's servers is immediately cut off when an employee is terminated.

24.     Access to MODE's physical premises is also secured. Visitors entering a MODE facility must check in at the front desk and are issued security badges that permit MODE to track entry and exit. Employees, too, have access badges that must be swiped for entry to the facility and secure areas within it.

25.     MODE has also implemented policies to ensure the security of its confidential information and trade secrets. MODE's employee code of conduct, as well as contracts with agents, require them to maintain MODE's business information in the strictest confidence, and not to use or disclose such information to any third party without authorization, or other than in accordance with their agreements with MODE. Employees are advised that their use of company devices and systems may be monitored, and are cautioned to limit use to business activities.

26.     MODE also requires all new agents and employees to sign agreements containing confidentiality provisions.

27.     As an added measure, MODE conditioned Kuriger and Kiefer's employment on their execution of the Employment Agreements, which were designed to protect MODE's important business relationships and MODE Confidential Information.

28.     Among other provisions, the Employment Agreements contained reasonable covenants to protect MODE's confidential information and business goodwill. These covenants are detailed in Section 2 of the Employment Agreements.

**C.     <u>The Non-Disclosure Provisions</u>**

29.     The Employment Agreements limit the use and removal of MODE's Confidential information (the "Non-Disclosure Provision"), as follows:

Executive agrees that all Confidential Information is and will be the exclusive property of MODE. Executive agrees not to copy, take, or remove, directly or indirectly, any Confidential Information from any premises or facility maintained or owned by MODE, except in performance of the duties assigned to Executive by MODE. Executive further agrees to preserve in confidence and not disclose, use, distribute, copy, publish, summarize or remove, either during or after the termination of Executive's employment or association with MODE, any Confidential Information, except as required in Executive's work for MODE or as authorized in writing by MODE.

Employment Agreements, § 2.5.1.

30.    "Confidential Information" includes, among other things:

- "information about the business, methods, business plans, operations, products, processes, and services of MODE or any Customer . . . or Carriers/Agents";

- "the identities of MODE's actual and prospective Customers and Carriers/Agents";

- "the volume of business and the nature of the business relationship between MODE and its Customers and/or Carriers/Agents";

- "the pricing of MODE's products, services and technology, including any deviations from its standard pricing for Customers and/or Carriers/Agents, as well as the financing methods employed by and arrangements between MODE and its existing or prospective Customers and/or Carriers/Agents";

- "load data and lane volumes"; and

- "MODE's business plans and strategy, marketing and sales plans and strategy, revenue, expense and profit projections, industry analyses, and any proposed or actual implemented technology changes."

*Id.* § 2.1.3.

31.    Kuriger and Kiefer further agreed that "Confidential Information may be contained on MODE's computer network, in computerized documents or files, or in any written or printed documents, including written reports summarizing such information." *Id.*

**The Non-Compete Provisions**

32.     The Employment Agreements also include non-competition provisions (the "Non-Compete Provisions"):

> Ancillary to the enforceable promises set forth in this Agreement, during the Restricted Period, Executive **will not and will not prepare to**, directly or indirectly, whether on Executive's own behalf or on behalf of any other person, business, or entity (for example, as an employee, agent, partner, independent contractor or consultant), **work for, become employed by, or provide consulting services to any Competing Business**, or supervise, manage, or support the development, manufacture, marketing, sales or operation of any Competing Business.

Employment Agreements § 2.9.1 (emphasis added).

33.     The term "Competing Business" is defined as "any individual, proprietorship, partnership, corporation, association, limited liability company, or other entity other than MODE that creates, develops, markets, or sells any product or service created, developed, marketed or sold, or planned to be created, developed, marketed or sold, by MODE while Executive was employed by MODE or that competes or is intended to compete with any product or service sold, offered, or otherwise provided by MODE, or that otherwise competes with the Business as conducted by MODE." *Id.* § 2.1.1.

34.     The "Restricted Period" is defined as "the period of time during Executive's employment or other services relationship with MODE and for one (1) year after the termination or cessation of Executive's employment or other services relationship with MODE." *Id.* § 2.1.7.

35.     Therefore, the Non-Compete Provisions prohibited Kuriger and Kiefer from working for a "Competing Business" both during the term of their employment with MODE, and for one year thereafter (i.e., until late August 2026).

**The Non-Solicit Provisions**

36.     The Employment Agreements also contain provisions prohibiting Kuriger and Kiefer from soliciting Covered Customers, Carriers, or Agents (the "Customer Non-Solicit

Provisions") and from soliciting MODE employees and contractors (the "Employee Non-Solicit Provision," and, together with the Non-Disclosure Provisions and the Non-Compete Provisions the "Protective Covenants").

37.    The Customer Non-Solicit Provisions state:

Ancillary to the enforceable promises set forth in this Agreement, during the Restricted Period, Executive **will not and will not prepare to**, directly or indirectly, whether on Executive's own behalf or on behalf of any other person, business, or entity (for example as an employee, agent, partner or consultant), other than for the benefit of MODE during the term of Executive's employment or other services relationship with MODE in furtherance of Executive's authorized duties and responsibilities for MODE: (a) **accept or solicit business from any Covered Customer or Carrier/Agent for any product or service that is competitive with or similar to** products or services offered by, manufactured by, designed by or distributed by MODE for which Executive had any responsibility for developing, providing, selling, managing, or manufacturing or about which Executive had access to Confidential Information of MODE during Executive's employment with MODE; or (b) **solicit, induce or encourage any Covered Customer or Carrier/Agent to cease doing business with MODE** or to terminate, limit, postpone, divert, or diminish an existing relationship, arrangement, business dealings, or patronage with MODE, or otherwise interfere with such Covered Customer's or Carrier/Agent's contracts, relationship or dealings with MODE.

Employment Agreements § 2.9.2 (emphasis added).

38.    A Covered Customer is:

any individual, proprietorship, partnership, corporation, association, limited liability company, or other business entity **who was or is a Customer or potential customer of MODE** at any time during the last twenty-four (24) months of Executive's employment with MODE and

(a) who or which Executive contacted, communicated with, solicited, called upon, worked for, sold products or services to, or dealt with on behalf of MODE;

(b) who Executive directed or managed others to contact, communicate with, solicit, call upon, work for, sell products or services to, or serve, on behalf of MODE;

(c) whose dealings with MODE were coordinated or supervised by Executive;

(d) about whom Executive obtained Confidential Information (as defined above) as a result of Executive's association with MODE; or

(e) who received services or products from MODE the sale or provision of which resulted in compensation or commission payments to or earnings for Executive.

*Id.* § 2.1.4 (emphasis added).

39.    The Employee Non-Solicit Provisions provide:

During the Restricted Period, Executive **will not and will not prepare to**, directly or indirectly, whether on Executive's own behalf or on behalf of any other person, business or entity (for example as an employee, agent, partner or consultant), other than for the benefit of MODE during the term of Executive's employment or other services relationship with MODE in furtherance of Executive's authorized duties and responsibilities for MODE: (a) **hire, solicit, attempt to persuade or otherwise encourage any individual who was an employee, contractor, or consultant of MODE** within twelve (12) months preceding the termination of Executive's employment or other services relationship with MODE (a "**Covered Employee**"), to terminate, limit, postpone, divert, diminish, or not commence or continue any employment or contractual relationship with MODE; or (b) disclose information about MODE employees or contractors to any other individual or entity that could be used to solicit or otherwise encourage those individuals or entities to form new business relationships with that or another individual or entity; or (c) otherwise interfere with the performance by current or former MODE employees or contractors of their obligations or responsibilities to MODE. Without limitation of the foregoing, if, at any time during the Restricted Period, Executive wishes to solicit or hire any Covered Employee who has been terminated by MODE in order to provide services to the Excluded Business (as defined in the Purchase Agreement), Executive may seek MODE's consent prior to such solicitation or hiring, which consent MODE may withhold in its sole discretion; provided that MODE's consent shall not be required in connection with any solicitation nor hiring of an Key Executive (as defined in the Purchased Agreement) who has been terminated by MODE. Nothing in this Section restricts Executive from exercising rights protected under the National Labor Relations Act. In addition to any other remedies provided for in this Agreement or under the law, in the event Executive violates the restrictions set forth in this Section 2.9.3, MODE shall be entitled to recover liquidated damages from Executive in the amount of the sum of the annual salary and bonus earned during the immediately preceding year by the person recruited, solicited, hired, or employed. The Parties acknowledge that it would be difficult to calculate damages incurred by MODE as a result of a breach of Section 2.9.3 and that this liquidated damages clause is necessary and reasonable for MODE's protection. The Parties also acknowledge that the foregoing damage amount is fair and reasonable.

*Id.* § 2.9.3 (emphasis added).

40.     Accordingly, the Non-Solicit Provisions prohibited Kuriger and Kiefer from soliciting Covered Customers, Carriers, Agents, or MODE's employees and contractors both during the term of their employment with MODE, and for one year thereafter.

41.     The Employment Agreements also provided that if Kuriger or Kiefer violated or threatened to violate the Protective Covenants:

> MODE will suffer immediate and irreparable harm that cannot be accurately calculated in monetary damages. Consequently, Executive acknowledges and agrees that, without limiting or waiving any other rights or remedies of MODE, MODE shall be entitled to (i) seek immediate injunctive relief, either by temporary or permanent injunction, to prevent such a violation; (ii) recovery of attorneys' fees and costs incurred or expended in obtaining such relief; and (iii) any other legal or equitable relief to which it may be entitled, including any and all monetary damages that MODE may incur as a result of said breach or threatened breach.

*Id.* § 4.

42.     Kuriger and Kiefer signed the Employment Agreements freely and willingly.

**Defendants Violated and Threaten to Continue Violating the Protective Covenants**

43.     Almost immediately after selling portions of their company to MODE, Defendants went straight to work to siphon business and profits from MODE. They secretly set up and operated competing businesses outside of MODE. They were aware of kickbacks being paid and even encouraged them. And they conspired with several MODE employees to set up competing businesses and create fraudulent agreements, in violation of their non-solicitation and non-competition provisions and in what are clear cases of fraud and breaches of their fiduciary duties.

44.     Through their conduct, Defendants have also tortiously interfered with MODE's customer contracts and with the employment contracts of several MODE employees.

45.     MODE discovered this conduct through an internal investigation it conducted earlier this year. Defendants took numerous steps to impede the investigation, including blocking MODE from obtaining access to important records they possess, delaying their interviews, and

lying about and attempting to conceal their wrongdoing. Their wrongful conduct—including both the wrongful acts uncovered in the investigation and their refusal to comply with directives from MODE during the investigation—left MODE with no choice but to terminate Defendants for Cause (as that term is defined in the EAPA), which it did on August 18, 2025. MODE seeks to prevent Defendants from continuing to breach their agreements.

### a. Kuriger and Kiefer defrauded MODE by falsely backdating an alleged agreement with a sales agent in order to carry out further schemes.

46.     MODE previously had a sales agent agreement for parcel brokerage with Steven Whitesides through his company, Summit Parcel LLC, in which Whitesides earned a standard 30% commission. MODE and Summit Parcel mutually terminated their agent agreement on February 29, 2024 after Whitesides allegedly retired from the business.

47.     Despite this termination, Summit Parcel and Whitesides began appearing in MODE's system as a sales agent again beginning around February 2025.

48.     On February 17, 2025, a MODE parcel employee, with Kuriger copied, emailed Brenda Cannon, a MODE accounting analyst, asking why Steven Whitesides was receiving only a standard 30% commission rather than a 40% commission. Christi Fox, MODE's VP of Finance Operations, asked that Kuriger and another MODE employee send her the sales agent agreement with Steven Whitesides evidencing his above-normal commission rate. Now-former MODE VP of Parcel, Matthew Larson ("Larson"), responded on February 19, 2025 with a purported copy of a February 15, 2024 "Addendum" to a sales agent agreement between Summit Parcel and Jillamy.

49.     As MODE has since discovered, the February 15, 2024 "Addendum" is an improperly backdated document not created until a year later in February 2025. Metadata shows this backdated agreement was actually created on February 19, 2025, over a year after the alleged execution date.

50.    Indeed, the evidence shows that Kuriger, alongside Larson, MODE parcel employees Andy Whitesides and Dwayne Shakespeare, and likely others, including Kiefer, engaged in a scheme to defraud MODE by creating a fictitious agreement purportedly establishing a higher-than-normal commission structure for Summit Parcel.

51.    On February 18, 2025, Larson emailed Kuriger and others, largely using non-MODE email addresses, providing the backdated agreement, inviting others to "make any adjustments as needed." Larson also "verif[ied] that there was 2.5M in revenue already being generated annually by this sales stud!"

**b.    Defendants set up a fake company run by a fake person to directly compete with MODE's parcel business.**

52.    Defendants agreed in their Employment Agreements that they would not "work for, become employed by, or provide consulting services to any Competing Business, or . . . support the development . . . or operation of any Competing Business" and made similar promises in the EAPA. They agreed not to compete with MODE, who just purchased a portion of Kuriger's and Kiefer's business, Jillamy, hired them as Senior Vice Presidents, and paid each of them $300,000.00 a year plus a potential earnout.

53.    Nevertheless, on February 5, 2025, Kuriger formally established a fraudulent entity, Ramsey Vance, LLC, in an attempt to funnel profits from MODE's parcel business.

54.    About two weeks later, Steven Whitesides requested a MODE customer activation for Ramsey Vance. MODE activated Ramsey Vance under Steven Whitesides' sales agent account, meaning that Whitesides would then receive commissions from MODE for sales to Ramsey Vance. The Customer Account Application submitted for Ramsey Vance lists a "Tim Amerway" as the point of contact for Ramsey Vance.

55.     MODE's investigation revealed that Tim Amerway is a fictitious person. Indeed, MODE has discovered that Amerway's purported email account is in fact monitored and used by a MODE employee. This MODE employee routinely interacted with other MODE employees under the Tim Amerway persona in an attempt to legitimize Ramsey Vance.

56.     Although Ramsey Vance was set up as a "customer" of MODE in MODE's system, Ramsey Vance was simply an intermediary between the ultimate customer and MODE. Kuriger has admitted to MODE that he set up Ramsey Vance to essentially broker transactions with third parties and run those transactions through MODE as if Ramsey Vance was the actual customer.

57.     Defendants' scheme worked as follows. First, MODE invoiced Ramsey Vance with a margin for MODE built in. Second, Ramsey Vance invoiced the ultimate customer with an additional margin built on top of the margin already charged by MODE. That additional margin did not flow back through MODE and was, unbeknownst to MODE, instead pocketed by Kuriger.

58.     Further, because Ramsey Vance is connected to Steven Whitesides' Summit Parcel sales agent account, MODE was obliged to pay Whitesides an above-average commission on the portion of the payments that did flow to MODE.

59.     MODE was therefore being cheated in two ways, in addition to the damage of having its own employees create fake companies with a fake representative: (1) being left out of the margins that Ramsey Vance charges to the ultimate customer, and (2) being forced to pay an additional commission to Whitesides.

60.     By way of example, Defendants solicited a MODE customer, AA Global, to do business through Ramsey Vance instead of MODE. Ramsey Vance used MODE's carriers to ship AA Global's inventory, and earned margin on the transaction, all while cutting into the margin MODE should have made had AA Global been working with MODE directly.

61.     This is a clear violation of the protective covenants in the Employment Agreements and EAPA. For instance, Defendants violated their Non-Compete Provisions by setting up and utilizing Ramsey Vance, LLC, which competes with MODE's parcel business and deprives MODE of money it should have otherwise received but for Defendants' actions. Furthermore, they solicited several MODE employees including Matthew Larson, Dwayne Shakespeare, and Andy Whitesides to violate their obligations and responsibilities to MODE by falsifying the Steven Whitesides/Summit Parcel agreement and setting up the fraudulent entity Ramsey Vance.

62.     Kuriger has also lied about these actions when interviewed by the Company. Kuriger originally claimed not to know who set up Ramsey Vance or any details about who Tim Amerway was. It was only when shown the actual evidence that Kuriger admitted he had a direct role in creating this fake company.

63.     Similar actions will continue unless Defendants are enjoined and restrained.

### c. Kiefer and Kuriger were fully aware of corruption and kickbacks being paid in MODE's Canadian office

64.     MODE's investigation has also uncovered that Kuriger and Kiefer were aware of and encouraged kickbacks being run out of MODE's Canada office.

65.     As part of the EAPA, MODE purchased the assets and acquired the employees of Jillamy's Canadian parcel brokering operations, Whiz Investments Limited ("Whiz"). Whiz, previously owned by Glen Bidwell ("Bidwell"), worked as an independent sales agent for MODE for years, providing, among other things, parcel brokering services.

66.     The Whiz agency agreement with MODE included, among other things, restrictions on Whiz's ability to assign its agency agreement or consummate a change of control of Whiz without MODE's consent. Despite its relationship with Jillamy, MODE was unaware of Jillamy's acquisition of Whiz in violation of the change of control provision of the agreement, and did not

consent to it until the purchase of Whiz was approved by MODE on September 25, 2023. At the time MODE approved the purchase of Whiz, MODE believed it was approving the purchase prospectively. It was not until mid-2024 that MODE learned the transaction it approved had already been consummated by Jillamy and Whiz over eight months before MODE's approval. In fact, Jillamy and Bidwell's knowing and flagrant breach of the Whiz agency agreement is highlighted in the consulting agreement Bidwell, his company Navigate IT & Logistics, Inc., and Whiz entered into concurrently with the transaction, which includes an indemnification provision wherein Whiz (owned by Jillamy post-transaction, who bears the economic cost) indemnifies Bidwell for any claims resulting from the assignment of the Whiz agency agreement without obtaining the prerequisite consent of MODE. Despite selling his former company to Jillamy, Bidwell remained heavily involved in the day-to-day operations of Whiz through his role as a consultant.

67.     With Kuriger and Kiefer's knowledge, Bidwell devised a scheme to pay MODE and Jillamy employees kickbacks in exchange for routing parcel business through his sales agent account with Whiz.

68.     Throughout 2024, Whiz, at the time a Jillamy subsidiary, covertly sent kickback money to MODE parcel employee Matt Larson in exchange for Larson's funneling of business through Bidwell's account. MODE so far has transaction history showing tens of thousands of dollars in payments from Whiz to Larson, as well as spreadsheets showing hundreds of thousands of dollars of payments. Whiz made similar kickback payments to Jillamy employees.

69.     In addition to the direct wire transfers to Larson, Larson received indirect compensation for his role in Jillamy and Whiz's scheme's through inappropriate and unexplainable salary increases to his wife, Katherine Larson, a Jillamy employee.  In just one year, Mrs. Larson's

salary nearly doubled from $52,000 per year to $102,000 per year with no apparent change in role or responsibilities. Furthermore, the paperwork for this salary raise was sent to Larson himself and not to his wife, highlighting the impropriety of the arrangement.

70. This overall scheme could not have worked without the participation of Kuriger's and Kiefer's Whiz and Jillamy employees.

71. MODE was unaware of this misconduct with Jillamy's Canadian operations and with Bidwell when it purchased the Canadian assets from Jillamy as part of the EAPA. Concurrent with the EAPA, Whiz assigned its consulting agreement with Bidwell and Navigate IT & Logistics, Inc. to MODE.

72. Bidwell's misconduct continued even after MODE took control over the Whiz office and its employees.

73. MODE's investigation into wrongdoing has uncovered serious wrongdoing by Bidwell that has harmed MODE including but not limited to the payment of kickbacks and improperly claiming commissions he was not entitled to.

74. Based on the litany of harmful misconduct perpetrated by Bidwell, MODE terminated its consulting agreement with him in July 2025.

75. Kuriger and Kiefer were both aware of Bidwell's misbehavior but did nothing to alert MODE.

76. In a June 9, 2025, email exchange regarding Bidwell's claimed commissions, Kuriger admitted: "I understand he pays other people but holy crap."

77. Moreover, Kuriger and Kiefer admitted in recent interviews that they suspected Bidwell's "shenanigans" but never brought them to the attention of MODE.

78.    Kuriger and Kiefer's deliberate choice not to raise any alarms regarding Bidwell's misdeeds prolonged the duration of harm Bidwell's actions caused MODE.  At best, their willful blindness towards Bidwell's unlawful behavior breached their fiduciary obligations to MODE.

### d. Defendants brokered business through Jillamy in violation of their Employment Agreements and the EAPA.

79.    As described above, MODE acquired Jillamy on November 1, 2024, and brought Jillamy employees in house in a "company store" model. The Jillamy-acquired employees, now MODE employees, would directly find customers and execute freight movements.

80.    But Defendants did not want to abide by their agreements with MODE. They wanted to continue Jillamy operations. Within months of the acquisition, a Jillamy-acquired employee, Beau Palmore, along with Kiefer, and likely Kuriger were still operating Jillamy as a competing brokerage. Unbeknownst to MODE, Jillamy would find customers, broker the deal using MODE's carriers, and cut MODE out from the deal.

81.    MODE recently discovered that during December 2024 into early January 2025, Jillamy-acquired employees, who should have been working for MODE, were instead working for Jillamy as a brokerage for customer MEDLOG and carrier R.E.D. Trucking. The deal went downhill because of shipping delays with R.E.D. Trucking, so Kiefer was asked to step in and resolve the issue to keep the customer MEDLOG satisfied. This entire transaction was done outside of MODE.

82.    Defendants blatantly violated the Non-Compete Provisions in the Employment Agreements and the EAPA. Even worse, they utilized Jillamy-acquired employees, who had then become MODE employees, to effectuate the direct competition with MODE by interfering with the MODE employee's performance of their duties and obligations to MODE.

83.     On May 16, 2025, a Jillamy employee discussed using Jillamy to "move [Over & Back] containers to our warehouse."

84.     Colin Kiefer, Defendant Kiefer's son and Jillamy's logistics coordinator, responded: "I don't understand why this wasn't done before I was transitioned downstairs, **I thought this was the whole point of this transition to run everything through Jillamy**."

85.     Defendants and Jillamy also started running freight brokerage business outside of MODE, including through Hudson Valley Trucking, an asset-based trucking company it acquired in 2023. Jillamy actively moved MODE acquired customers to Hudson Valley Trucking.

86.     For example, in a February 17, 2025 email, Defendant Kuriger stated in an email: "I would like it to start immediately if you have not billed some things out, then go ahead and start billing it as hudson valley."

87.     MODE seeks to restrain Defendants from continuing to violate the Non-Compete Provisions.

**e.  Breaches involving Steven Stumpo.**

88.     MODE has recently become aware of breaches and tortious activities by another former Jillamy employee, Steven Stumpo.

89.     On August 18, 2025, MODE terminated Stumpo's employment.

90.     On August 21, 2025, Stumpo attempted to contact a Senior Director at Scrub Daddy, a MODE client.

91.     Stumpo also recently attempted to contact representatives of Sofidel America.

92.     By doing so, Stumpo is attempting to breach his protective covenants.

93.     MODE believes Stumpo is working with Kuriger and/or Kiefer in an attempt to lure MODE customers away.

94.    MODE sent Stumpo a cease and desist letter, but is concerned his actions are continuing.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Contract)

95.    MODE re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

96.    The Employment Agreements are a valid and binding contract between MODE and Kuriger and Kiefer.

97.    The Employment Agreements specify that the laws of the State of Texas govern the Agreements. *See* Employment Agreement § 9.

98.    The EAPA specifies that the laws of the State of Delaware govern the Agreement. *See* EAPA § 8.3.

99.    Defendants have breached the Non-Compete Provisions in the Employment Agreements and in the EAPA by creating and operating Ramsey Vance, which provides brokerage services in direct competition with MODE.

100.    Defendants also breached the Non-Solicitation Provisions in the Employment Agreements and in the EAPA by actively soliciting existing and potential MODE Covered Customers, and by soliciting MODE employees to assist in operating the side brokerage businesses.

101.    Kuriger and Kiefer further breached the Non-Solicitation Provisions in the Employment Agreements and in the EAPA by interfering with the obligations and responsibilities owed to MODE by current and former MODE employees in establishing fictitious entities and creating fraudulent documents.

102.    Kuriger and Kiefer also breached the Non-Disclosure Provisions in both the Employment Agreements and the EAPA.

103.    They likewise breached the Non-Compete Provisions by using Jillamy as a competing brokerage entity and offering brokerage services that compete directly with MODE.

104.    And they breached the Non-Solicitation Provisions by soliciting a potential MODE Covered Customer and utilizing MODE employees to effectuate the improper brokerage through Jillamy.

105.    MODE has complied with all conditions precedent, including in the Employment Agreements and the EAPA.

106.    As a direct and proximate result of Defendants' violations of the protective covenants in the Employment Agreements and EAPA, MODE has suffered and will continue to suffer damages.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

107.    MODE re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108.    Defendants owe MODE fiduciary duties, including the duties of loyalty, care, and confidentiality. Defendants owe MODE a fiduciary duty to deal openly and to fully disclose to MODE information affecting its business.

109.    Defendants have acted disloyally and failed to disclose potential conflicts with MODE in setting up the competing brokerage business Ramsey Vance.

110.    Defendants have usurped business opportunities for themselves and others at the expense of MODE, including by soliciting MODE's existing and potential customers, such as AA Global and MEDLOG.

111.    Defendants have misapplied fiduciary property, including by using MODE's Confidential Information for the purpose of competing with MODE, warranting uncapped exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE § 41.008(c)(10).

112.    Defendants were further disloyal to MODE when they participated in fraudulently backdating the Summit Parcel agency agreement, which forced MODE to acquire the agency agreement and its higher-than-average commission price.

113.    Defendants were likewise disloyal when they were aware of and encouraged kickbacks in clear violation of MODE policies.

114.    Defendants also breached their fiduciary duties to MODE by actively impeding MODE's investigation and otherwise covering up their knowledge of their own wrongdoing and the misconduct of other MODE representatives.

115.    As a direct and proximate result of Defendants' violations of their fiduciary duties, MODE has suffered and will continue to suffer damages.

### THIRD CAUSE OF ACTION
**(Tortious Interference with MODE Employees' Protective Covenants)**

116.    MODE re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

117.    Defendants are aware that MODE has contracts with its employees that contain non-compete and non-solicit obligations similar to the ones in the Employment Agreements and in the EAPA.

118.    Kuriger and Kiefer intentionally induced MODE employees, including Matthew Larson, to violate their non-compete and non-solicitation obligations by involving them in creating Ramsey Vance.

119.    Defendants intentionally induced MODE employees, including Beau Palmore, to violate their non-compete and non-solicitation obligations by involving them in illegally brokering business through Jillamy.

120.    Defendants intentionally induced former MODE employees, including Steve Stumpo, to violate their non-compete and non-solicitation obligations by involving them in illegally brokering business through Jillamy.

121.    Defendants will continue to intentionally induce the current and former MODE employees to do the same.

122.    As a direct and proximate result of Defendants' tortious interference with MODE's employees, MODE has suffered and will continue to suffer damages.

## FOURTH CAUSE OF ACTION
### (Tortious Interference with MODE's Customers)

123.    MODE re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

124.    Defendants actively solicited and diverted Covered Customers away from MODE. In addition, Colin Kiefer, Defendant Kiefer's son, made clear the intent to "transition to run everything through Jillamy." And Defendants and Jillamy started running freight brokerage business outside of MODE, including through a Jillamy-owned company, Hudson Valley Trucking.

125.    Defendants will continue to do the same with other MODE customers.

126.    Defendants knew that, had they not solicited and diverted those customers away from MODE, there was a reasonable probability that these potential customers would have entered into a contractual relationship with MODE.

127.    There is a reasonable probability that the customers would have contracted and will contract with MODE.

128.    As a direct and proximate result of Respondents' tortious interference with MODE's existing and prospective customers, MODE has suffered and will continue to suffer damages.

## APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

129.    MODE re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

130.    MODE is entitled to an injunction under principles of equity and the laws of Texas. See Tex. Civ. Prac. & Rem. Code § 65.011(3).

131.    "The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending trial on the merits." *Miller v. Talley Dunn Gallery, LLC*, No. 05-15-00444-CV, 2016 WL 836775, at *3, *5, *12-14 (Tex. App.—Dallas Mar. 3, 2016, no pet.). To obtain a temporary injunction, the petitioner must show: "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). MODE meets each element.

132.    It is without question that a "company's customer lists, pricing information, client information, and marketing strategies have all been recognized as trade secrets." *Miller*, 2016 WL 836775 at *12.

133.    Furthermore, "[t]he interruption of business relations and the disclosure of trade secrets can constitute irreparable harm that entitles the applicant to injunctive relief." *Id.* at *6

(citing *Dickerson v. Acadian Cypress & Hardwoods, Inc.*, No. 09-13-00299-CV, 2014 WL 1400659, at *5 (Tex. App.—Beaumont Apr. 10, 2014, no pet.)).

134.     Moreover, evidence that a defendant has "retained . . confidential information and had used or disclosed it" is strong evidence that the plaintiff has "suffered an irreparable injury, and [has] no adequate remedy at law." *Sandberg v. STMicroelectronics, Inc.*, 600 S.W.3d 511, 537 (Tex. App.—Dallas 2020, pet. denied).

135.     In this Verified Petition, MODE has asserted causes of action for breach of contract, breach of fiduciary duty, and tortious interference.

136.     MODE also seeks a temporary restraining order and temporary injunction, which are necessary to protect MODE from irreparable harm.

137.     Injunctive relief is recognized as a proper remedy to protect confidential information and customer goodwill in the context of a breach of a non-compete covenant.[2]

138.     MODE will suffer a probable injury if Kuriger and Kiefer are not immediately enjoined from: (1) using or disclosing to others any of the Mode Confidential Information; (2) competing with MODE within the terms of the Non-Compete Provisions; and (3) soliciting MODE's Customers, Carriers, Agents, Employees, and Contractors within the terms of the Non-Solicit Provisions.

139.     Damages are an inadequate remedy because it is impossible to calculate with certainty the monetary damages related to MODE's loss of goodwill, its customers, profits, and market share resulting from Kuriger and Kiefer's breaches of the Employment Agreements.

---

[2] *Keurig Dr. Pepper Inc. v. Chenier*, No. 4: 19-CV-505, 2019 WL 3958154, at *11 (E.D. Tex. Aug. 22, 2019) ("In Texas, injury resulting from the breach of non-compete covenants is the epitome of irreparable injury.") (quoting *A & A Global Indus., Inc. v. Wolfe*, CIV.A. 3: 01CV1515-D, 2001 WL 1388020, at *5 (N.D. Tex. Nov. 6, 2001)).

140.    The sworn facts in this Verified Petition show that (1) MODE has a probable right of recovery on its causes of action against Kuriger and Kiefer; (2) MODE will suffer imminent harm and irreparable injury for which there is no adequate remedy at law if Kuriger and Kiefer's conduct is not restrained by a temporary restraining order and temporary injunction[3]; (3) the threatened harm to MODE from Kuriger and Kiefer's conduct outweighs any potential harm to Kuriger and Kiefer resulting from the issuance of injunctive relief; (4) there is no countervailing hardship upon Kuriger and Kiefer, who have been earning lucrative salaries for years and received tens of millions of dollars from the sale of their business to MODE; and (5) public policy favors the use of injunctive relief to prevent loss of customers, goodwill, and profits.

141.    In the Employment Agreements, Kuriger and Kiefer agreed that a breach of the Protective Covenants would cause irreparable injury to MODE. MODE has presented evidence that it has suffered and will continue to suffer damages that cannot be measured and that the injury to MODE cannot be remedied by money damages. Accordingly, MODE has shown that it has no adequate remedy at law.

142.    MODE respectfully asks that the Court to enter a Temporary Restraining Order and, upon a hearing, a Temporary Injunction enjoining Kuriger and Kiefer from: (1) using or disclosing to others any of the Mode Confidential Information; (2) competing with MODE within the terms of the Non-Compete Provisions; and (3) soliciting MODE's Customers, Carriers, Agents, Employees, and Contractors within the terms of the Non-Solicit Provisions.

---

[3] *See, e.g.*, *Butnaru*, 84 S.W.3d at 204 ("An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard."); *Rugen v. Interactive Bus. Sys., Inc.*, 864 8.W.2d 548, 551 (Tex. App. Dallas 1993, no writ) (defendant's possession of confidential information and evidence that defendant was in a position to use it justified inference of probable irreparable injury).

## BOND

143.     Texas Rule of Civil Procedure 684 provides that "the court shall fix the amount of security to be given by the applicant." Trial courts have "considerable discretion in setting the amount of the bond." *Hsin-Chi-Su v. Vantage Drilling Co.*, 474 S.W.3d 284, 304 (Tex. App. Houston [14th Dist.] 2015, pet. denied).

144.     In the Employment Agreements, the Parties agreed that "the bond to be posted if any injunction is sought by MODE shall not exceed $1,000.00." Employment Agreements, § 4.

145.     MODE suggests that a reasonable bond amount is five hundred dollars ($500).

## REQUEST FOR HEARING ON MODE'S APPLICATION FOR TEMPORARY INJUNCTION

146.     MODE requests that this Court schedule a hearing at which time Kuriger and Kiefer should be required to appear and show cause why a temporary injunction should not be issued prohibiting Kuriger and Kiefer's activities until such time as this matter is fully resolved at arbitration, and that, upon such a hearing, a temporary injunction be issued prohibiting Kuriger and Kiefer's activities through arbitration.

## PRAYER

WHEREFORE, MODE respectfully requests that Kuriger and Kiefer be cited to appear and answer herein, and that the Court award Plaintiff:

(1)     A temporary restraining order restraining Kuriger and Kiefer from:

    a.     Using or disclosing any MODE Confidential Information, including but not limited to: MODE's client list, confidential sales and marketing strategies, and pricing information;

    b.     Competing with MODE within the meaning of the Non-Compete Provisions;

      c.      Soliciting MODE's Customers, Carriers, or Agents, within the terms of the Customer Non-Solicit Provisions; and

      d.      Soliciting MODE's employees and contractors, within the terms of the Employee Non-Solicit Provisions.

(2)      Upon hearing, a Temporary Injunction restraining Kuriger and Kiefer from:

      a.      Using or disclosing any MODE Confidential Information, including but not limited to: MODE's client list, confidential sales and marketing strategies, and pricing information;

      b.      Competing with MODE within the meaning of the Non-Compete Provisions;

      c.      Soliciting MODE's Customers, Carriers, or Agents, within the terms of the Customer Non-Solicit Provisions; and

      d.      Soliciting MODE's employees and contractors, within the terms of the Employee Non-Solicit Provisions.

(3)      An award of attorneys' fees and costs to MODE;

(4)      Any and all other relief at law or equity to which MODE is entitled.

      Respectfully submitted this 28th day of August, 2025.

GREENBERG TRAURIG LLP

/s/ G. Michael Gruber_____
G. Michael Gruber
State Bar No. 08555400
mike.gruber@gtlaw.com
Christina M. Carroll
State Bar No. 24092868
christina.carroll@gtlaw.com
Zachary B. Tobolowsky
State Bar No. 24106512
Zachary.tobolowsky@gtlaw.com
2200 Ross Avenue
Suite 5200
Dallas, TX 75201
Telephone:  (214) 665-3600
Facsimile:  (214) 665-3601

Jake Evans (*pro hac vice application
forthcoming*)
Georgia Bar No. 797018
Philip J. George (*pro hac vice application
forthcoming*)
Georgia Bar No. 441996
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
P: (678) 553-2100
F: (678) 553-2212
Jake.Evans@gtlaw.com
Philip.George@gtlaw.com

*Attorneys for Plaintiff*

## VERIFICATION

1.      My name is Lance Wayne Malesh. I am over the age of 18, of sound mind, and capable of making and am competent to make this declaration and verification.

2.      I am the President and Chief Executive Officer of Plaintiff MODE Global, LLC ("MODE").

3.      I have read the allegations in the foregoing Verified Petition and Application for Temporary Restraining Order and Temporary Injunction in this action, and verify that each and every factual allegation stated in each of the paragraphs of the Petition are true and correct and are within my personal knowledge, based on information available to me in my capacity as President and Chief Executive Officer of MODE, and based on information available to me from employees and representatives of MODE.

My name is Lance Wayne Malesh, my date of birth is 07/07/1970, and my address is 14785 Preston Road, Ste 850, Dallas, TX 75254. I declare under penalty of perjury that the foregoing facts stated in this declaration are within my personal knowledge and are true and correct.

Executed in Dallas County, State of Texas, on the __ day of August, 2025.

_Lance N Malesh_

Lance Wayne Malesh